1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>        vs.<br><br>ARMANDO CAZAREZ-SANTOS,<br><br>                              Defendant. | CASE NO. 12cr3447-LAB-2 and 14cv2306-LAB<br><br>**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255** |

Petitioner Armando Cazarez-Santos ("Cazarez"), a Mexican citizen, pled guilty pursuant to a plea agreement to one count of transporting illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II), and judgment was entered against him on December 19, 2012. He was sentenced to twelve months in custody, followed by three years of supervised release.  He filed no appeal, and his conviction became final on December 28, 2012.

On June 21, 2013, after Cazarez completed serving the custodial portion of his sentence, he was served with a notice to appear for removal proceedings and placed in detention. The notice informed him that his alien smuggling conviction was considered an aggravated felony, and that he was removable. On January 21, 2014, after an immigration hearing, he was removed to Mexico. On May 28, 2014, he was apprehended while illegally entering the United States, and is presently charged with returning to the United States after deportation, in violation of 8 U.S.C. § 1326.

1        On September 29, 2014, Cazarez filed a petition pursuant to 28 U.S.C. § 2255 to

2    vacate his conviction for alien smuggling. The United States opposes that motion on the

3    grounds that the petition is time-barred and otherwise lacks merit. On November 10, the

4    Court held a hearing and received evidence. The Court made findings of fact and announced

5    its decision from the bench, but also specified that its decision from the bench would be

6    supplemented by a written decision.

7        In his petition, Cazarez argues that his trial counsel committed error under *Padilla v.*

8    *Kentucky*, 559 U.S. 356 (2010) by failing to adequately advise him of the risk of deportation.

9    As the party seeking to set aside his conviction, he bears the burden of showing he is

10    entitled to relief.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

11    **Hearing and Findings**

12        At the hearing, Cazarez called his trial counsel, Steven Pactor, who testified regarding

13    what advice he had given Cazarez while representing him on the alien smuggling charge.

14    Both sides agreed that Cazarez waived the attorney-client privilege by calling into question

15    the effectiveness of Mr. Pactor's legal representation, and that Mr. Pactor could testify

16    regarding the advice he gave regarding immigration consequences.  Mr. Pactor testified at

17    length, and was subject to questioning by Cazarez and the Government, and also by the

18    Court. Cazarez did not testify, and did not present any other evidence beyond what he had

19    submitted in his written petition.

20        Mr. Pactor testified that he did not recall the specific words that he used in advising

21    Cazarez of the immigration consequences that would follow from an alien smuggling

22    conviction, but he stated that it is his practice to advise his clients regarding immigration

23    consequences, and that he did not deviate from his usual practice in this case.  The essence

24    of Mr. Pactor's testimony was that he advised Cazarez that a guilty plea would definitely

25    result in deportation proceedings, and that he was likely to be deported.  He characterized

26    his advice this way: "You're likely to be deported, but never say never." In other words,

27    deportation was likely, but Mr. Pactor could not positively rule out the possibility that Cazarez

28    ///

1   might avoid it.  He testified that Cazarez's version of the advice, which ascribed a much more

2   tentative warning about deportation, did not "ring true" to him.

3       Mr. Pactor testified that his standard procedure is to tell all clients in Cazarez's

4   position that they are likely to be deported, but not to say that deportation is "certain."  He

5   explained that it would be irresponsible of him to tell a client that there was no chance at all

6   of avoiding deportation, because sometimes it can be avoided.  For example, he testified

7   that a client might be eligible for asylum or for what he called a "snitch visa," under which the

8   client avoids deportation by providing assistance to the government.[1]   Mr. Pactor also

9   testified that he routinely advises his clients that they should hire an immigration attorney if

10  they are intent on avoiding deportation, and he tries not to provide detailed immigration

11  advice himself.

12      At Cazarez's change of plea hearing, Magistrate Judge William Gallo asked Mr.

13  Pactor whether he had advised Cazarez about the possibility of deportation. (Pet., Ex. B at

14  2:12–25.) Mr. Pactor responded that the portion of the plea agreement dealing with possible

15  immigration consequences "mimics the conversation [he] had with [Cazarez] yesterday."

16  Cazarez argues that Pactor's statement meant that the lawyer had advised him only about

17  striking the stipulated deportation language from the plea agreement – a subject that came

18  up during the Rule 11 hearing – and not more. But the Court disagrees with this

19  interpretation and finds it implausible.

20       The colloquy between Mr. Pactor and Judge Gallo concerned Cazarez's desire to

21  strike the stipulated removal provision that was in the original draft of the plea agreement,

22  not whether Cazarez understood the likelihood of deportation. That was the subject

23  conversation that Pactor referred to when he stated that he had spoken with Cazarez

24  "yesterday" and that Pactor said "mimics" what was in the agreement.  Mr. Pactor was not

25  asked by Judge Gallo to recount all previous advice he had provided to Cazarez about the

26  immigration consequences of an alien smuggling conviction – the subject that he testified

27  _____

28       [1] Although Mr. Pactor did not testify regarding this, it is worth remembering that Cazarez was a junior member of a team of alien smugglers. It is at least possible that he might have been eligible for this form of relief.

1  about before this Court.  When he took the stand at the § 2255 hearing, Mr. Pactor clarified

2  what general advice he had given. His advice regarding the likelihood of Cazarez's

3  deportation was far more thorough than the terse colloquy during the Rule 11 hearing, and

4  Mr. Pactor was thoroughly examined about it.  After observing and considering Mr. Pactor's

5  testimony, the Court finds that it was credible in all particulars and believes his account.

6        In addition to the advice that Mr. Pactor gave Cazarez before he pled guilty, and in

7  addition to the warnings Cazarez received during the Rule 11 proceeding, both Mr. Pactor

8  and the Court discussed deportation during Cazarez's sentencing hearing.   Mr. Pactor

9  related that his client:

10        is an individual who has substantial ties to the United States. He is someone
      who is not a hundred percent going to be deported but definitely going to be
11        in deportation proceedings. The family has retained immigration counsel, and
      I negotiated this plea. And I know enough to know what language is in there,
12        but we checked with immigration counsel.

13  (Sentencing Hearing Tr. (Docket no. 85) at 5:2–7).  Mr. Pactor's statement at the sentencing

14  hearing fully corroborates his testimony at the § 2255 hearing.  The Court finds it significant

15  that Cazarez was present during the sentencing hearing, and was obviously aware of what

16  was being said.  In fact, the sentencing transcript reveals that shortly after Mr. Pactor spoke,

17  Cazarez was asked if he had anything to say.  Cazarez took the opportunity to speak, but

18  he never disputed or sought to clarify anything that Mr. Pactor had said, nor did he even

19  mention the subject of deportation. (*Id*. at 5:18–6:1.) Later at the hearing, the Court

20  reiterated the likelihood of deportation while setting the conditions of supervised release. "If

21  Mr. Cazarez does not succeed in immigration court and he is deported, then there'll be two

22  conditions of supervised release . . . ." (*Id*. at 8:4–8.)

23        Based on all of the evidence, the Court finds Mr. Pactor told Cazarez that he would

24  definitely be in deportation proceedings, and that he would more than likely be deported,

25  although deportation was not 100% certain.

26  **Timeliness**

27        Cazarez recognizes that his petition under § 2255 was filed after the one-year

28  limitations period had already run.  He nevertheless argues that the petition is not time-

1  barred for two reasons. First, he says his claim did not accrue until his removal became

2  administratively final. Second, he argues that he is entitled to equitable tolling because of

3  attorney abandonment. At the hearing, the Court denied Cazarez's petition as untimely

4  because it was brought well after the one-year limitations period had expired and there was

5  no sufficient basis to find tolling.

6     Cazarez relies on *Johnson v. United States*, 544 U.S. 295 (2005) in support of his

7  argument that the limitations period on his claim did not begin to run until his removal was

8  administratively final.  In other words, he believes that his claim did not accrue as it ordinarily

9  would on the date his conviction became final.  He argues that the final removal order

10  amounted to a new fact, and therefore pursuant to § 2255(f)(4), the limitations period began

11  to run on that later date.  He also argues that until he was actually removed, he was relying

12  on his defense lawyer's allegedly inadequate advice.  His claim therefore accrued, he

13  maintains, on the date of removal.

14     The Government points out that *Johnson* is distinguishable. In *Johnson*, a state

15  court's decision directly affected the petitioner's claim; he could not have filed a habeas

16  petition until the state court decision was entered. Here, by contrast, the removal order itself

17  was not a new fact underlying or giving rise to Cazarez's habeas claim.  By no later than the

18  date that he pleaded guilty, Cazarez knew the facts underlying his habeas claim, *i.e.*, that

19  he had been given certain advice by his attorney, that he was not an American citizen, and

20  that he had to plead guilty to the offense of alien smuggling.  That he may not have realized

21  the legal significance of those facts until later makes no difference.  For example, in *Chang-*

22  *Cruz v. Hendricks*, 2013 WL 5966420, slip op. at *3 (D.N.J., Nov. 7, 2013), the court held

23  that a non-citizen's claim accrued in 2005, when he pleaded guilty, and not later when he

24  realized that the plea would result in his deportation.  Although that court was dealing with

25  the limitations period of § 2244(d)(1), the analysis applies with equal force here:

> Mr. Chang–Cruz was aware that he was not an American citizen. He was
> aware that he had pled guilty to the drug offenses when his conviction
> became final in 2005. Mr. Chang–Cruz may not have been aware of the
> precise legal consequences of his guilty plea (potential deportation), but he
> was aware of the vital facts underlying his claim. Furthermore, Mr.
> Chang–Cruz was specifically instructed by the state court at the plea hearing

1
2
3
4

that his guilty plea could impact his immigration status. That placed him at least on inquiry notice, even if the precise consequences of his guilty plea did not materialize until he was picked up by immigration officials in June 2010. These facts do not give rise to a claim of delayed accrual under Section 2244(d)(1)(D). The case law consistently draws a distinction between delayed awareness of vital facts (which will delay accrual), and delayed awareness of the legal significance of those facts (which will not).

5   *Id.*

6       A more recent Supreme Court decision confirms this conclusion. In *Chaidez v. United*

7   *States*, __ U.S. __, 133 S.Ct. 1103 (2013), the Court addressed the issue of whether *Padilla*

8   applied retroactively.   The petitioner had pleaded guilty, and while she was still fighting

9   removal, *Padilla* was decided. *Id*. at 1106.   The Court announced that *Padilla* was not

10  retroactive, and determined that she couldn't benefit from the decision, because her

11  conviction was final before it was decided. In other words, her *Padilla* claim accrued when

12  her conviction became final, and not later when she was finally ordered removed.

13      Nor is Cazarez entitled to pre-removal tolling based on lack of notice of the likelihood

14  of removal.   In its ruling from the bench, the Court determined that the colloquy at sentencing

15  (discussed above) gave Cazarez notice that deportation was likely.   At the very latest,

16  Cazarez knew that he would likely be deported when he was served with a order to show

17  cause notice (OSC) on June 21, 2013, that required him to show cause why he should not

18  be deported.   It is undisputed that Cazarez was served with the OSC while he was in

19  custody, and that he remained in continuous immigration custody from the time he

20  completed his sentence until he was deported.   During this period, he also hired an

21  immigration lawyer to fight the deportation.   Cazarez offered no evidence that the

22  immigration lawyer failed to inform him of the likelihood of deportation.

23      Cazarez argues in the alternative that he is entitled to equitable tolling because his

24  subsequent immigration lawyer abandoned him. The petition provides only some of the

25  relevant dates.   The facts as pleaded, however, make clear the attorney did not abandon

26  Cazarez.  Rather, the attorney was hired on October 28, 2013, and he almost immediately

27  thereafter ordered and read the plea hearing transcript.  After reading the transcript, the

28  attorney told Cazarez that he had no ineffective assistance of counsel claim, and so the

immigration lawyer did not file a § 2255 petition on Cazarez's behalf. (Pet. at 11:19–25.) This is not attorney abandonment; at most, it amounts to debatable legal advice.  But even if the immigration attorney's actions amounted to malpractice — and the Court does not believe that they did — it was not the kind of egregious misconduct that would support equitable tolling.  *See Hunter v. Galaza*, 366 Fed. Appx. 766, 767 (9th Cir. 2010) (citing *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir. 2001) and *Shannon v. Newland*, 410 F.3d 1083, 1090 (9th Cir. 2005)) ("mere negligence or professional malpractice" will not meet the threshold for equitable tolling under AEDPA; tolling is available only where the attorney has committed "egregious misconduct").  It is also clear that Cazarez knew no petition had been filed, and did not file one himself. Assuming the immigration attorney's advice was wrong, nothing prevented Cazarez himself from filing a § 2255 petition before the limitations period had run. Instead, Cazarez waited ten months after the one-year limitations period had run to hire an immigration attorney, and then he waited many months after that to file his petition in this case.  In fact, he waited over a year after he was specifically informed that his plea to an aggravated felony rendered him deportable before filing anything.  In other words, even if equitable tolling applied during the period his immigration attorney allegedly mishandled his case, it would not make his petition timely.

Because the petition is untimely, relief under § 2255 is unavailable, and the petition is denied primarily for that reason.  The Court emphasizes, however, that Cazarez has not established that the performance of either Mr. Pactor or of the immigration attorney was ineffective.  Nor has he established that even if it was, he was prejudiced by the allegedly deficient advice.  *See Padilla*, 559 U.S. at 366 (holding that prejudice, *i.e.*, the reasonable likelihood of a different outcome, is an element of an ineffective assistance of counsel claim). The petition is therefore denied on those additional grounds.

**Ineffective Assistance**

Both *Padilla* and the Ninth Circuit's decision in *United States v. Bonilla*, 637 F.3d 980 (9th Cir. 2011) hold that a defendant should be informed of any clear immigration consequences before pleading guilty.  The Court put it this way in *Padilla*: "when the

1   deportation consequence is truly clear . . . the duty to give correct advice is equally clear."

2   559 U.S. at 369. Notably, this admonition does not establish a particular quantum of certainty

3   by which the clarity or thoroughness of defense counsel's advice should be measured.  In

4   *Bonilla*, the Ninth Circuit opined that a defendant has the right to be told that his deportation

5   is "virtually certain" when that is the case.  637 F.3d at 985.  However, as was the case in

6   *Padilla*, the defendant in *Bonilla* received *no* advice regarding the risk of deportation before

7   pleading guilty — not merely misadvice about the likelihood of deportation.  In *United States*

8   *v. Ruiz*, 548 Fed. Appx. 410 (9th Cir. 2013), the Ninth Circuit cited *Bonilla*'s "virtually certain"

9   language, and treated it as establishing a standard of performance. But *Ruiz,* like *Bonilla,*

10  was an appeal from the denial of a defendant's motion to withdraw a guilty plea, and

11  discussed *Bonilla* in the context of applying the more generous "fair and just reason"

12  standard. *See Ruiz*, 548 Fed. Appx. at 411.

13       Older Ninth Circuit cases established a standard that attorneys need only inform their

14  clients of the "possible consequences," "potential consequences," or "likely consequences"

15  of their guilty pleas. *See Womack v. Del Papa*, 497 F.3d 998, 1003–04 (9th Cir. 2007);

16  *Gonzalez v. United States*, 33 F.3d 1047, 1048 (9th Cir. 1994). This standard required that

17  a defendant be informed of consequences that were likely, not the likelihood of each

18  consequence. *See Brady v. United States*, 742, 748 and n.6 (1970) (using both "likely

19  consequences" and "possible consequences" to describe advice a defendant must be given,

20  in order to render his plea knowing and intelligent). In fact, the Supreme Court has held that

21  an attorney's mistaken predictions of the probability of the consequences of taking or

22  rejecting a plea does not amount to ineffective assistance of counsel and does not render

23  a plea involuntary. *See McMann v. Richardson*, 397 U.S. 759, 770–71 (1970). And, as

24  *Strickland* has made clear, "No particular set of detailed rules for counsel's conduct can

25  satisfactorily take account of the variety of circumstances faced by defense counsel . . . ."

26  466 U.S. at 688–89.

27       In view of these precedents, this Court does not read *Padilla as* purporting to

28  announce a new, heightened standard for attorney effectiveness, higher than that

1  recognized in *McMann* and other decisions.  Rather, this Court understands that the effect

2  of *Padilla* was to extend the *Strickland* standard and require attorneys to provide advice

3  about the collateral consequence of the risk of deportation. *Chaidez,* 133 S.Ct. at 1111–12

4  (explaining that *Padilla* had the effect of applying *Strickland* to immigration consequences,

5  and then conducted a *Strickland* analysis).  In other words, the existing *Strickland* standard

6  still applied; *Padilla* did not announce a new, heightened standard for attorney performance

7  when advising about immigration matters.  Reading *Padilla* as Cazarez does would have the

8  effect of overruling decades of precedent sub silentio, and would be unreasonable.  This is

9  particularly true because that decision did cite other decisions it was disapproving. *See*

10  *Padilla*, 559 U.S. at 370 (citing with disapproval lower court decisions distinguishing between

11  failure to advise and affirmative misadvice).  *See also Minority Television Project, Inc. v.*

12  *F.C.C.,*736 F.3d 1192, 1198 (9th Cir. 2013) ("We do not credit Minority TV's argument that

13  *Citizens United* . . . overruled decades of precedent sub silentio — especially given that the

14  Court there expressly overruled two other cases with no mention of [the precedent Minority

15  TV was challenging] or an intent to change the level of scrutiny . . . .").  And because *Padilla*

16  did not undermine or change the earlier standard set forth in both Supreme Court and Ninth

17  Circuit decisions, the three-judge panel that decided *Bonilla* was bound by that earlier

18  standard as well.

19       This Court is reluctant to characterize the "virtually certain" language in *Bonilla* as

20  mere dicta that can be disregarded, or at least, that need not be followed as broadly as the

21  opinion suggests.  But this Court believes that construing *Bonilla's* "virtually certain"

22  admonition as dicta is the correct way to read the case.  An earlier point bears reiteration:

23  Both *Padilla* and *Bonilla* dealt with defendants who received *no* advice at all.  The issue of

24  an attorney's obligation to tell a defendant that deportation was "virtually certain" (as

25  opposed to possible, probable, highly likely, or some other level of probability) was not

26  presented in either case — or in any other Supreme Court or Ninth Circuit decision that this

27  Court is aware of.  Neither case purported to reject or set aside the older standard that

28  attorneys need only inform their clients of the "possible consequences," "potential

consequences," or "likely consequences" of their guilty pleas.  And because no three-judge panel of the Ninth Circuit has the power to overrule existing Circuit precedent, except in the extremely narrow circumstance (not present here) where an older case is "clearly irreconcilable" with higher authority, *see Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), it is unlikely that *Bonilla* intended to repudiate the holdings in *Womack* and *Gonzalez* without even mentioning those cases by name. Furthermore, a *requirement* that attorneys must couch advice concerning the likelihood of deportation in terms of "virtual certainty" is inconsistent with the Supreme Court's holding that an attorney's mistaken predictions of the probability of the consequences of taking or rejecting a plea does not amount to ineffective assistance of counsel and does not render a plea involuntary. *See McMann,* 397 at 770–71.

It's also apparent to this Court that the "possible consequences" standard makes a good deal more practical sense than the alternative of requiring attorneys to expertly quantify the probability of deportation. Criminal defense attorneys are not, generally speaking, also immigration attorneys. And even if they were, they would not be expected to predict with absolute precision how an immigration court would rule on a given case.  "Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken . . . as to what a court's judgment might be on given facts." *McMann*, 397 U.S. at 770.  A requirement that the likelihood of deportation be precisely quantified also makes almost impossible the district courts' responsibility of confirming that defendants have been properly advised before they plead guilty. While competent in immigration law, a district court does not have the same record in front of it that an immigration court has, and cannot with any degree of precision predict the degree of probability that any given defendant will be in fact deported. *See id.*  That is to say, a district court often will have no information to evaluate the advice an attorney gave to a defendant regarding the relative likelihood of deportation, and thus to meaningfully assess the knowing and intelligent character of the plea as it pertains to that advice.

///

Furthermore, reading the remarks in *Padilla* and *Bonilla* as literally and broadly as Cazarez would have the Court do would, at least sometimes, lead to incompetent advice. Attorneys are supposed to give reasonable, balanced advice that permits their clients to make informed decisions. *See e.g., Purdy v. United States* 208 F.3d 41, 44–45 (2d Cir. 2000) (citing *Strickland* and other cases for the principle that advising clients regarding plea decisions amounts to steering between the "Scylla of inadequate advice and the Charybdis of coercing a plea"). They are not required nor expected to provide the direst warnings possible, or to give uniform warnings to every client according to an established script. *See Strickland*, 466 U.S. at 688–89 (emphasizing the wide variety of correct ways to represent clients, and the impossibility of setting rules to guarantee attorney competence). There are a number of ways non-citizen defendants who plead guilty to aggravated felonies can avoid deportation. If attorneys are universally required to advise their clients they were "virtually certain" to be deported, most defendants would undoubtedly accept that advice as true, and as a result some would be dissuaded from taking advantage of favorable provisions of law that might exempt them from deportation. Others might effectively be coerced by excessively dire warnings into going to trial when in fact, pleading guilty is their best option. *See Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986) (coercion of a plea by a defendant's own counsel renders the plea involuntary).

This is not to suggest, of course, that attorneys may incorrectly characterize highly probable consequences of a guilty plea as highly improbable (or vice versa), or otherwise mislead their clients regarding the general likelihood of deportation. *See, e.g., United States v. Kwan*, 407 F.3d 1005, 1008–09 (9th Cir. 2005) (abrogated on other grounds by *Padilla*) (counsel's incorrect advice that there was "no serious possibility" of deportation was ineffective, where changes in immigration law had rendered deportation highly likely). This Court merely concludes that an attorney's responsibility does not extend so far as to require him or her to provide formulaic warnings to every client, or to precisely handicap the probability of deportation.

///

12cr3447 and 14cv2306

This Court therefore adheres to the older standard, which it believes survives *Padilla*, and concludes that even after *Padilla* attorneys need only inform their clients accurately of the possible consequences of guilty pleas; they do not have to predict with exactitude the likelihood of those consequences. In the context of this case, Mr. Pactor's advice that deportation was likely though not completely certain was therefore competent.

**Prejudice**

A petitioner bringing an ineffective assistance of counsel claim must show a "reasonable probability" that he was prejudiced by his attorney's errors. *See Strickland*, 466 U.S. at 688. Cazarez argues that he would have done all he could to avoid deportation, including accepting the strong likelihood of a longer sentence. While this claim could conceivably be true, the facts of the case and Mr. Pactor's testimony make it very improbable to believe.

Cazarez argues that had he been told deportation was "virtually certain," he would not have pled guilty, and instead would have held out for a plea deal that did not require him to plead to an aggravated felony. If such a deal were not forthcoming, he says, he would have gone to trial. He points to his refusal to stipulate to deportation in his plea agreement as evidence supporting this stance.

The Court finds to the contrary that there is no reasonable likelihood that Cazarez would have insisted on going to trial, nor was he in a position to negotiate a plea to a lesser charge. The facts of the case bear out this conclusion. Cazarez was apprehended near the U.S.-Mexico border after border patrol agents witnessed approximately eleven aliens getting into a pickup truck that he was driving. When that agents pulled the truck over, gave Cazarez *Miranda* warnings, and questioned him, Cazarez admitted that he was a smuggler and that he was being paid $100 per alien. (Pet., 5:16–23.) The prosecutor offered Cazarez a plea agreement that included a two-level decrease for acceptance of responsibility and a two-level departure for fast-track. In view of the strength of the evidence, going to trial and foregoing the deal would have been irrational. And based on the Court's experience in handling dozens of alien smuggling cases over the past 30 years, it is very unlikely that

1  Cazarez would have been successful in obtaining a plea deal any more favorable than the
2  one he received.

3       Mr. Pactor's testimony bolsters this conclusion.  He testified that after reviewing the
4  evidence, he advised Cazarez to plead guilty because the case was "not defensible." Mr.
5  Pactor pointed out that had Cazarez gone to trial, he would have lost the benefit of fast-track
6  and the other concessions the Government was offering. In addition, the prosecutor may
7  have added other charges.  Any of these circumstances would have increased Cazarez's
8  exposure to greater jail time. The best Mr. Pactor was able to do for Cazarez with regard to
9  immigration consequences, he said, was to have the stipulated deportation provision
10 stricken.

11      Other facts also call into question whether avoiding deportation was a priority to
12 Cazarez.  Cazarez was told in June 2013 that his aggravated felony conviction rendered him
13 deportable, yet he made no attempt to withdraw his plea until approximately fifteen months
14 later.  His current petition seems to be motivated more by his latest arrest for illegal reentry,
15 and his effort to defend against that charge.  In other words, Cazarez's primary goal appears
16 to be avoiding conviction and punishment for the instant offense, rather than squabbling over
17 whether he was properly deported a year ago.  These additional facts undercut his assertion
18 that had he known with "virtual certainty" that he would be deported, he would have done
19 whatever he could have to avoid that outcome or lessen the chances of it, even if it meant
20 accepting a longer sentence. Even assuming Mr. Pactor had advised Cazarez that
21 deportation was virtually certain instead of giving the advice he did, the Court finds that there
22 is no reasonable probability Cazarez would have made a different decision.

**Conclusion and Order**

24      The petition is **DENIED** because it is untimely. In the alternative, it is denied because
25 Cazarez's trial counsel was not ineffective in violation of *Padilla*. Also in the alternative, the
26 ///
27 ///
28 ///

1   petition is denied for failure to show prejudice; even if Cazarez's trial counsel was ineffective,

2   there is no reasonable probability of a different outcome.

3       The petition is **DENIED**.

4

5       **IT IS SO ORDERED**.

6   DATED:  December 5, 2014

7

8       **HONORABLE LARRY ALAN BURNS**
        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -                    12cr3447 and 14cv2306